UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CINDY CHARRETTE,

                Plaintiff,                        Civil Action No. 15-10930
                                                    Honorable Judith E. Levy
v.                                                Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 16]**

Cindy Charrette ("Charrette") commenced this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties filed motions for summary judgment, which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's evaluation of Charrette's credibility as it pertains to her mental impairments is not supported by substantial evidence in the record. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [**16**] be **DENIED**, Charrette's Motion for Summary Judgment [**15**] be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks outright reversal and an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be **REMANDED** to the Administrative Law Judge ("ALJ") for further proceedings consistent with this Report and Recommendation.

## II.    REPORT

### A.    Procedural History

On May 17, 2012, Charrette filed the instant application for SSI, alleging an amended disability onset date of May 17, 2012. (Tr. 72, 241).   The claims were initially denied on September 24, 2012. (Tr. 129).   Thereafter, Charrette filed a timely request for an administrative hearing, which was held on October 3, 2013 before ALJ Melvyn B. Kalt. (Tr. 85-117). Charrette, who was represented by counsel, testified at the hearing, as did vocational expert Elizabeth A. Pasikowski. (*Id.*).   In a written decision dated November 26, 2013, the ALJ determined that Charrette is not disabled. (Tr. 70-80).  On January 12, 2015, the Appeals Council denied review. (Tr. 1-5).  Charrette filed for judicial review of the final decision on March 12, 2015. (Doc. #1).

### B.    Framework for Disability Determinations

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:   If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240, at *21 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).   "The burden of proof is on the claimant throughout the first four steps . . . [i]f the analysis [then] reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."   *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.   Background

#### 1.   *Disability Reports*

In an undated disability report, Charrette indicated that she suffers from bipolar disorder, panic attacks, and post-traumatic stress disorder. (Tr. 190).  Charrette reported that she stopped working on June 15, 1998, as a result of these conditions. (*Id.*).  With respect to her education level, Charrette completed four or more years of college. (*Id.*).  Prior to stopping work, Charrette was employed as a customer service specialist for a medical supplies company and a dental assistant. (Tr. 191).   At the time of the report, Charrette was taking Abilify (depression), alprazolam (anxiety), bupropion (depression), flexeril (muscle relaxer), levothyroxine (thyroid), lexapro (bipolar disorder), lithium (mood stabilizer), methylphenidate (attention deficit disorder),

prenatal vitamins (enema), trazodone (sleep deprivation), zolpidem (sleep deprivation). (Tr. 192).

In her September 17, 2012 function report, Charrette stated that she lives in a house with her family. (Tr. 199). She noted that her conditions impact her ability to work because she suffers from panic attacks on a consistent basis; she has periods of major depression, mania, and attention deficit disorder resulting in motivation difficulties and problems staying in one position; and she suffers from arthritis, carpal tunnel syndrome and fibromyalgia that hinder her ability to accomplish daily tasks. (*Id.*). When asked to describe her daily activities, Charrette indicated that she takes her medications, attempts to maintain her emotional stability, and attends psychological counseling sessions. (Tr. 200). Her nervousness interferes with her sleep. (*Id.*). Charrette indicated that she does provide some care for her children when her husband is not home and that she prepares household meals. (*Id.*). Charrette reported that she experiences pain when she lifts objects or when she dresses and bathes herself. (*Id.*). She is able to perform basic hygiene, feed herself, use the restroom, and care for her hair (after receiving a reminder) without assistance. (*Id.*). However, she needs to be reminded to shower and take or refill her medication. (*Id.*).

Charrette noted that she is able to prepare easy meals such as cereal, soups, and pasta, although it takes her a long time because of muscle pain. (Tr. 201). Her difficulty with cooking often results in panic attacks. (*Id.*). Charrette performs yard work with difficulty because of the pain associated with fibromyalgia and she often needs redirection due to her attention deficit disorder. (*Id.*). She indicated that she goes shopping once or twice a month for toiletries. She does not go food shopping because she finds it to be too frustrating. (Tr. 202). She is able to drive a car or sit in the passenger seat. (*Id.*). Charrette is unable to pay bills or balance a

checking account, but she is able to count change and handle a savings account. (*Id.*).  Her main hobbies are reading (intermittently), writing (intermittently), and listening to music. (Tr. 203). She stated that she suffers panic attacks when her reading or writing do not go as well as expected. (*Id.*).  Charrette visits immediate family and talks to relatives on the phone "a couple of times a week." (*Id.*).  While Charrette attends religious services and travels to psychological counseling sessions every week, she stated that she "constantly" forgets to go to her sessions. (*Id.*).  She indicated that she frequently fights with her husband because "he has a hard time understanding my illnesses." (Tr. 204).

When asked to identify functions impacted by her conditions, Charrette checked lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (*Id.*).  She can walk at least 15 minutes before needing to rest (depending on her pain level) and she can only pay attention to a specific task for five minutes at a time. (*Id.*).  Charrette reported that she does not follow written instructions well and she has difficulty following spoken instructions due to lack of concentration. (*Id.*).  She does not get along with authority figures; she does not handle stress well because of anxiety, mania, depression, and panic attacks; and she has difficulty with changes in routine. (Tr. 205).  Charrette uses a wrist brace for activities involving the use of her hands. (*Id.*).  She also indicated that she suffers from side effects after taking the following medications: zolpidem/ambien (daytime drowsiness, throat irritation, diarrhea, dizziness, dry mouth, headaches), trazodone (diarrhea, dizziness, dry mouth, headaches, nervousness), lithium carbonate (mild hand tremors, loss of appetite, thirst), bupropion (flushing, increased urination, nervousness); and Abilify (abnormal dreams, light-headedness, restlessness, tiredness). (Tr. 206).

The record also reflects that Charrette's husband drafted a third-party function report dated September 20, 2012. (Tr. 215-222). Contrary to her own function report, Charrette's husband noted that she has "no problem" with any matters of personal care; she does not need to be reminded to take of personal needs and grooming; and that her conditions do not cause any physical impairments. (Tr. 216, 217, 220). He indicated that she only has problems with completing tasks, concentration, and understanding. (Tr. 220).

2.      *Charrette's Testimony*

At the time of the October 3, 2013 hearing before the ALJ, Charrette stated that all five of her children live with her and her husband in a private home. (Tr. 90, 92). She served in the United States Navy from 1986 through 1994. (Tr. 91). Charrette testified that she suffers from bipolar disorder, attention deficit disorder, anxiety disorder, panic attacks, fibromyalgia, rheumatoid arthritis, chronic lower back pain, and carpal tunnel syndrome. (Tr. 93). She was also diagnosed with post-traumatic stress disorder during her service with the military. (*Id.*).

Regarding her mental impairments, Charrette indicated that she had been hospitalized for bipolar disorder several times. (*Id.*). In 2005, she had been involuntarily committed to a hospital for bipolar disorder treatment, which lasted for three months. (*Id.*). At the time of the hearing, Charrette noted that she was treating with a psychiatrist who prescribed her several anti-depression and anti-anxiety medications. (Tr. 94). She also received counseling from a licensed social worker. (*Id.*). Charrette stated that she suffers from panic attacks several times a week and that these episodes generally last between a half-hour and an hour. (Tr. 95). She frequently stays at home due to depression and has difficulty sleeping. (Tr. 96). Charrette attributed her inability to sleep to the pain in her back and joints along with her anxiety condition. (*Id.*). She reported suffering from "nervous eating," crying spells (every two to three days), memory lapses, and

6

lack of concentration. (Tr. 97-98).   She doubted whether she could stay on task even when provided with simple instructions. (Tr. 98).   Charrette also asserted that she does not like to be supervised and she frequently gets angry at other people. (Tr. 108-09).

In terms of her physical impairments, Charrette indicated that she suffers from pain in both of her wrists, which she rated as a six on a scale of one to ten. (Tr. 99).   She testified that she has difficulty holding objects, pushing a shopping cart, and opening a jar, although she can button her clothing and use a zipper with some pain. (*Id.*).   Charrette also reported that she suffers from pain in both of her ankles, which she rated as seven on a scale of one to ten. (Tr. 100).   She stated that she does not have the stamina to walk around like she used to on account of her ankle pain. (*Id.*).   As for her lower back, Charrette rated her pain (after taking medication) as an eight on a scale of one to ten. (Tr. 99-100).   She indicated that her back pain prevents her from lifting and grabbing objects and that she has to lie on her side for approximately two to three hours during the day. (Tr. 101-02).   Charrette reported that she must alternate between sitting for a half hour and standing for 20 minutes; she is able to walk for 10 yards before she needs to rest due to severe ankle pain; she can lift a maximum of five pounds at a time and carry it a distance of a few yards; and she has difficulty hearing especially with background noise. (Tr. 108-09).

With respect to daily activities, Charrette reported she is able to dress and shower on her own, although her husband must remind her to shower. (Tr. 103).   She is able to clean the dishes with some assistance from her husband because she cannot maintain her focus "long enough to get them all done." (*Id.*).   Her husband prepares dinner, cleans the laundry, performs the yard work, and does most of the grocery shopping. (Tr. 103-05).   Charrette stated that she no longer goes shopping on account of her depression and that she cannot push a shopping cart because of

7

her wrist pain. (Tr. 104). She expressed concern that she would not be able to balance a checking account and noted that her husband pays all of the household bills. (Tr. 105). While she is able to drive herself to doctors' appointments, Charrette noted that she experiences anxiety attacks on the road, particularly when she is stuck in traffic. (Tr. 106). In these situations, she testified that she typically takes Xanax to calm herself. (*Id.*).

Charrette reported that she visits with friends two to three times a month and that she takes her children to the park every few weeks although she does not play with them because of her pain and short attention span. (Tr. 107-08). She also stated that her husband mostly takes care of her younger children. (Tr. 108).

### 3. Medical Evidence

The Court has thoroughly reviewed the record, and will discuss the relevant medical evidence within the analysis portion of this Report and Recommendation.

### 4. Vocational Expert's Testimony

Elizabeth A. Pasikowski testified as an independent vocational expert ("VE"). (Tr. 114-17). The ALJ asked the VE to imagine a claimant of Charrette's age, education, and work experience, who was limited to simple unskilled work involving no contact with members of the general public or co-workers and no activities requiring constant use of the hands for grasping or gripping (Tr. 114-15). At the unskilled sedentary work level, the VE stated that the hypothetical individual would be capable of working in the positions of video surveillance monitor (1,400 regional jobs, 139,000 nationally), visual inspector, (1,200 regional jobs, 148,000 nationally). (Tr. 47-48). At the unskilled light work level, the VE indicated that the hypothetical individual could perform work as a visual inspector (1,700 regional jobs, 174,000 nationally). (Tr. 115).

Counsel then asked the VE what off-task percentage would be permissible before

Charrette would be precluded from work. (Tr. 116).  The VE responded that 20 percent off-task would be work preclusive. (*Id.*).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Charrette is not disabled under the Act.  At Step One, the ALJ found that Charrette has not engaged in substantial gainful activity since May 17, 2012 the alleged onset date. (Tr. 72).  At Step Two, the ALJ found that Charrette has the severe impairments of bipolar disorder, post-traumatic stress disorder, anxiety disorder, and carpal tunnel syndrome. (*Id.*).  At Step Three, the ALJ found that Charrette's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 74-76).  The ALJ then assessed Charrette's residual functional capacity ("RFC"), concluding that she is capable of performing a full range of work at all exertional levels with the following nonexertional limitations: "simple, unskilled work involving no contact with the general public or co-workers; and no constant use of hands involving grasping or gripping or manipulation." (Tr. 76).

At Step Four, the ALJ determined that Charrette has no past relevant work. (Tr. 79).  At Step Five, based in part on the VE's testimony, the ALJ concluded that Charrette is capable of performing a significant number of jobs that exist in the national economy. (Tr. 79-80).  As a result, the ALJ concluded that Charrette is not disabled under the Act. (Tr. 80).

### E.    Submission of New Evidence to Appeals Council

Charrette appealed the ALJ's decision to the Appeals Council.  While her appeal was pending, she apparently began residing at a women's shelter due to alleged abuse by her husband. (Tr. 29).  Charrette was then admitted to Havenwyck Hospital's inpatient psychiatric unit where she remained for approximately 11 days with very serious psychotic findings. (Tr.

17-36).  She was discharged, but was involuntarily committed at the same facility about two months later with even more severe psychotic findings and aggressive behavior.  (Tr. 37-59).  Evidence regarding these commitments (Tr. 17-59) (which the Court will discuss below, *see infra* fn. 9) was submitted to the Appeals Council, which denied Charrette's appeal on the ground that it relates to a "later time" than that considered by the ALJ.  (Tr. 2))

### F.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Charrette v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (stating that "an ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### G.     Analysis

Charrette argues on appeal that the ALJ erred at Step Two of the sequential evaluation by finding that her fibromyalgia and back pain are not severe impairments and altogether failing to evaluate whether her peripheral neuropathy, bilateral ankle pain, and anemia constitute severe impairments. (Doc. #15 at 11). She also maintains that the ALJ's RFC assessment does not account for her "severe fatigue, severe pain, and problems walking due to her bilateral ankle issues" and that it omits any limitations associated with her moderate limitations in maintaining concentration, persistence, and pace ("CPP"). (*Id.* at 14-15). Finally, Charrette contends that the ALJ improperly determined that her subjective complaints were not credible. (*Id.* at 15-16). As

11

discussed below, of these three arguments, only the third has any merit whatsoever, though, largely for reasons not specifically raised by her counsel.

       *1.*    *Step-Two Determination*

At Step Two, the ALJ concluded that Charrette has the severe impairments of bipolar disorder, post-traumatic stress disorder, anxiety disorder, and carpal tunnel syndrome. (Tr. 72). Charrette now argues that the ALJ should have additionally found that her fibromyalgia and back pain qualify as severe impairments under the Act. (Doc. #15 at 11).

Substantial evidence and the applicable regulations support the ALJ's determination that Charrette's fibromyalgia and back pain are non-severe impairments. 20 C.F.R. § 416.920(c) defines a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ." In turn, "basic work activities" are defined in the regulations as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *See id.* At Step Two, the burden is on Charrette to establish that her physical and mental impairments are sufficiently severe. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("The claimant first must bear the burden . . . at step two that she has a medically severe impairment or combination of impairments . . .").

In this case, the ALJ appropriately declined to find that either Charrette's alleged fibromyalgia or her alleged back pain were "severe impairments." With respect to the

fibromyalgia condition, the ALJ noted that "there are insufficient medical findings to support a finding that fibromyalgia is a severe medically determinable impairment." (Tr. 73-74). While the ALJ acknowledged that a fibromyalgia diagnosis is not typically discernible from clinical laboratory findings, he observed that "there are certain indicators that must be present in order to establish" the condition. (Tr. 74). The ALJ then consulted Social Security Ruling ("SSR") 12-2p, 2012 SSR LEXIS 1 (Jul. 25, 2012), which enumerates the criteria for evaluating whether a claimant has a medically determinable impairment of fibromyalgia. Under SSR 12-2p, a medically determined impairment of fibromyalgia can be demonstrated either by: (1) a history of widespread pain in all quadrants of the body, at least eleven positive tender points found bilaterally on the body (both above and below the waist), and clinical evidence that other disorders that could cause the symptoms were excluded; or (2) a history of widespread pain in all quadrants of the body, repeated manifestations of six or more fibromyalgia symptoms, and clinical evidence that other disorders that could cause the symptoms were excluded.[1] *Id.* at *5-6. After reviewing the record, the ALJ correctly found no objective medical evidence, whether in the form of physical exams or diagnostic laboratory testing, that satisfies either of the standards found in SSR 12-2p. *See id.* at *2-3 ("As with any claim for disability benefits, before we find that a person with an [medically determinable impairment] of [fibromyalgia] is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities . . ."). In fact, the July 2013 treatment notes from Charrette's chiropractor documenting her complaints of fibromyalgia indicate no tender points anywhere in the spinal region. (Tr. 367-68). And Charrette highlights nothing in the record that otherwise contradicts the ALJ's findings on this issue.

---

[1]  Although the ALJ never explicitly referenced SSR 12-2p, he evaluated Charrette's fibromyalgia under that ruling's first set of diagnostic criteria. (Tr. 74).

As for Charrette's alleged back pain, the ALJ appropriately noted that "the regulations [] provide that under no circumstances may the existence of impairment be established on the basis of symptoms alone.  Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities, i.e., medical signs and laboratory findings."  (Tr. 73) (citing SSR 96-4p).  SSR 96-4p provides, in relevant part, "A 'symptom' is not a 'medically determinable physical or mental impairment' and no symptom by itself can establish the existence of an impairment."  It is unclear, then, how the ALJ could have erred in failing to find Charrette's back pain to be a severe impairment, as Charrette seems to argue he should have done.

Moreover, while the evidentiary record contains a May 2011 X-ray of Charrette's spine which evidenced "multilevel disc space narrowing, degenerative endplate and spurs disc space narrowing more pronounced at C5-C6 and C6-C7 narrowing," and physical exam results around the same time showed posterior cervical muscle strain and tenderness in her trapezius muscles, these records pre-date her amended alleged onset date of May 17, 2012.  (Tr. 382, 394).  The only relevant medical records post-dating the amended alleged onset date are the July 2013 treatment notes from Charrette's chiropractor showing that she exhibited only slight disc narrowing at C4-C7 and T2-T6 and some tenderness at C2. (Tr. 369, 372).  In short, substantial evidence supports the ALJ's finding that Charrette's back pain did not constitute a severe impairment.[2]  *See Marlow v. Comm'r of Soc. Sec.*, No. 13-11276, 2014 U.S. Dist. LEXIS 19268,

---

[2] Charrette argues in passing that the ALJ erred by failing to develop the medical record pertaining to her severe back pain. (Doc. #15 at 11).  As the Sixth Circuit has held, however, a Social Security claimant "carries the burden of establishing disability."  *Wilson v. Commissioner of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008).  Thus, the general rule is that the claimant is responsible for furnishing the medical and other evidence supporting her application for benefits.

at \*14 (E.D. Mich. Jan. 15, 2014) (affirming ALJ's decision that claimant's "mild degenerative bony spurs and slight narrowing of the L4-L5 disc space," among other things, did not qualify as a Step-Two severe impairment).

Charrette further asserts that the ALJ erred at Step Two by failing to evaluate whether her peripheral neuropathy, bilateral ankle impairment, or anemia constitute severe impairments. (Doc. #15 at 11). This contention is unavailing. As the Commissioner accurately observed in her brief (Doc. #16 at 6), Charrette never alleged that she suffered from any of these conditions in her undated disability report (Tr. 190); her disability report on appeal showed that the only change in her condition was a diagnosis of fibromyalgia (Tr. 223); and Charrette did not mention any of these physical impairments in her pre-hearing brief before the ALJ (Tr. 237) or her brief to the Appeals Council. (Tr. 241). Similarly, Charrette points to no objective medical findings that would lead the ALJ to conclude that the above conditions qualify as severe impairments. Thus, the ALJ did not commit reversible error in failing to find these conditions severe at Step Two "as there is no need to impose limitations based on a condition that . . . was not even alleged by the claimant to be severe in the first instance." *Smith v. Colvin*, No. 13-12700, 2014 U.S. Dist. LEXIS 58243, at \*19 (E.D. Mich. Mar. 18, 2014); *see also Hughes v. Astrue*, No. 07-3130, 2011 U.S. Dist. LEXIS 98940, at \*31 (N.D. Ohio Aug. 5, 2011) (ALJ did not err in finding condition non-severe where claimant did not allege condition affected ability to work). In sum,

---

*See* 20 C.F.R. § 416.912(a). Although exceptions to this general rule exist in certain circumstances, courts have recognized that an ALJ only has a "special, heightened duty" to develop the administrative record when the claimant is without counsel, incapable of presenting an effective case, and unfamiliar with hearing procedures. *See Wilson*, 280 F. App'x at 459 (citing *Lashley v. Secretary of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). According to the *Wilson* court, "[a]bsent such special circumstances . . . this court repeatedly affirms that the claimant bears the ultimate burden of proving disability." *Id.* at 459. In this case, where Charrette does not (and cannot) contend that any of the "special circumstances" apply, her argument that the ALJ should have further developed the medical record is without merit.

the Court perceives no reason to reverse the ALJ's Step-Two determination as it is supported by substantial evidence in the record.

Finally, even if the ALJ erred in failing to find any of the above alleged "impairments" to be "severe," such an error would be harmless.  As the ALJ noted in his decision, at Step Two he was required to determine whether Charrette has "a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe.'" (Tr. 71) (citing 20 C.F.R. § 416.920(c)).  Thus, the ALJ's finding that Charrette suffers from any severe physical or mental impairment was all that was required for him to progress to Step Three.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Secretary's failure to find that claimant's cervical condition constituted a severe impairment did not constitute reversible error where he found the existence of other severe impairments and proceeded to Step Three).  This legal principle is aptly explained in *Maziarz*.

In *Maziarz*, the plaintiff allegedly suffered from various impairments.  At Step Two, the Secretary found that Maziarz's heart conditions constituted a "severe" impairment under the regulations, but did not find his alleged cervical condition to be "severe." *Id.* at 242, 244.  Ultimately, the Secretary found Maziarz not disabled.  Maziarz argued on appeal that the Secretary erred by not finding his cervical condition to be severe. *Id.* at 244.  The Sixth Circuit rejected that argument, holding that because the Secretary had found at least one other "severe" limitation, the severity of Maziarz's cervical condition was irrelevant to the Step Two analysis:

> According to the regulations, upon determining that a claimant has one severe impairment, the Secretary must continue with the remaining steps in his disability evaluation as outlined above. In the instant case, the Secretary found that Maziarz suffered from the severe impairment of [heart disease].  Accordingly, the Secretary continued with the remaining steps in his disability determination.  Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform

16

> substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error.

*Id.* at 244. In other words, once the ALJ finds a severe impairment at Step Two, he moves on to the remaining sequential steps where he considers the claimant's severe and non-severe impairments. *Id.*; *see also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *Fisk v. Astrue*, 253 F. App'x 580, 584 (6th Cir. 2007) (noting that once the ALJ determines at least one severe impairment, he "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'") (citing SSR 96-8p, 1996 SSR LEXIS 5, at *14 (Jul. 2, 1996); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003). Here, after the ALJ found that Charrette had certain "severe" impairments, he proceeded to the next sequential steps in the disability analysis (Tr. 72-78), and specifically noted that he was "tak[ing] into account [Charrette's] general complaints of body pain, but only to the extent supported by the medical evidence of record." (Tr. 74). Thus, the ALJ's finding that some of Charrette's impairments were not severe is at most harmless error, and cannot be grounds for remand.

## 2. RFC Assessment

Next, Charrette asserts that the RFC determination failed to account for the exertional limitations resulting from her severe fatigue, pain, and bilateral ankle impairment. The Court finds this argument unpersuasive. The record is devoid of any objective medical evidence either verifying these conditions or supporting a determination that they should be incorporated into the RFC. As the ALJ appropriately noted, "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." (Tr. 78). And, again, Charrette does not draw the Court's

17

attention to any objective medical findings that would undermine the ALJ's conclusion in this regard.

Furthermore, Charrette's contention that the ALJ failed to thoroughly review the medical evidence related to her physical impairments lacks merit. (Doc. #15 at 13). The ALJ evaluated a July 2008 EMG showing no evidence of cervical radiculopathy, but indications of ulnar neuropathy across the ulnar groove and distally, and minor carpal tunnel syndrome in the left wrist. (Tr. 287). He also considered the August 2008 treatment notes from neurologist Thomas Giancarlo, D.O., recommending further imaging of the left elbow to rule out ulnar nerve entrapment and a lateral chest x-ray to rule out thoracic outlet syndrome. (Tr. 249). X-rays of the left elbow later revealed no evidence of fracture or joint effusion and the lateral chest x-ray showed no acute infiltrate, effusion or pneumothorax. (Tr. 247). Based on these results, Dr. Giancarlo diagnosed Charrette with left ulnar nerve entrapment and peripheral neuropathy. (Tr. 245). Dr. Giancarlo ordered a "musculoskeletal ultrasound of the left elbow with attention to the ulnar nerve to check for entrapment etiology" and a nerve disease laboratory work-up. (Tr. 246). While Dr. Giancarlo noted that Charrette would return in three months for further testing, the ALJ found no indication from the record that she ever did, or that her symptoms persisted beyond the alleged amended onset date. (*Id*; Tr. 77). In any event, the ALJ accounted for the diagnosis of carpal tunnel syndrome by appropriately limiting Charrette's RFC to "no constant use of hands involving grasping or gripping or manipulation." (Tr. 76).

Considering her mental impairments, the ALJ further limited Charrette's RFC to the performance of "simple, unskilled work involving no contact with the general public or co-workers." (Tr. 76). Charrette now contends that this portion of the RFC assessment does not adequately reflect the ALJ's Step-Three determination that she has moderate CPP limitations.

(Tr. 75). This is a frequently litigated issue in the Eastern District of Michigan.

It is true that, in certain situations, courts have held that limiting a claimant to merely "simple," "unskilled," or "routine" work is insufficient to address moderate CPP deficiencies.[3] It is equally true, however, that courts have held that, under some circumstances, limitations like those imposed by the ALJ in the instant case adequately account for such deficiencies. *See, e.g., Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005) ( "unskilled" work limitation in RFC was sufficient to account for ALJ's finding that claimant "often" experiences issues with CPP); *Edmunds v. Comm'r of Soc. Sec.*, No. 09-13076, 2010 U.S. Dist. LEXIS 95356, at *21-23 (E.D. Mich. Aug. 17, 2010) (substantial evidence supported ALJ's finding that claimant with moderate CPP deficiencies could perform "simple, routine, repetitive" work).

There is no bright-line rule requiring remand whenever an ALJ's RFC finding includes a limitation to "unskilled work" but does not contain a more specific concentration-related limitation. *See Jones v. Comm'r of Soc. Sec.*, No. 11-14176, 2012 U.S. Dist. LEXIS 136172, at *29 (E.D. Mich. Sep. 24, 2012); *Caradine v. Comm'r of Soc. Sec.*, No. 12-10614, 2013 U.S. Dist. LEXIS 14036, at *22-23 (E.D. Mich. Jan. 11, 2013). Rather, the Court must look at the record as a whole and determine whether substantial evidence supports the RFC. *See Jones*, 2012 U.S. Dist. LEXIS 136172, at *29-30; *Caradine*, 2013 U.S. Dist. LEXIS 14036, at *22-23; *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 U.S. Dist. LEXIS 103452, at *9 (E.D. Mich. Sep. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the

---

[3] *See, e.g., Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007); *Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 U.S. Dist. LEXIS 65349, at *30-31 (E.D. Mich. Jun. 30, 2009).

facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace.").

In this case, the Court need not resolve the issue because it is recommending that this case be remanded on a related issue – the ALJ's credibility analysis as to Charrette's mental impairments.  On remand, if the ALJ finds Charrette to be not disabled, he should thoroughly discuss the evidence and reasoning behind the mental RFC he imposes.

### 3.    *Credibility Determination*

As the Sixth Circuit has held, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain, or other symptoms, is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the severity of his symptoms are credible. SSR 96-7, 1996 SSR LEXIS 4, at *3 (Jul. 2, 1996); *see also* 20 C.F.R. § 416.929.  Even considering this deferential standard, the Court finds that the ALJ's credibility determination cannot stand with respect to Charrette's mental impairments.

Construed liberally (which the Court should not have to do when a claimant is represented by counsel) Charrette challenges the ALJ's credibility determination.  Although the Court finds some significant error in the ALJ's credibility analysis, that finding largely rests on

20

the Court's evaluation of different record evidence than that highlighted by Charrette.  For instance, Charrette argues that the "ALJ's entire decision is seemingly based on [her] ability to have 'car rides' and 'run errands.'  (Tr. 78).  However, the ALJ does nothing to explain the statement and further follows up with an unintelligible diatribe about daily activities that [Charrette] cannot decipher or attempt to explain."  (Doc. #15 at 16).  This argument misses the mark because the fact that Charrette was capable of giving car rides to others and engaging in various activities does cut against her claimed level of *physical* impairment.  While the ALJ could have more thoroughly discussed Charrette's daily activities in the Step III section of his decision, earlier in the written decision he had noted evidence in the record that Charrette was capable of preparing meals, "shopping for some items," driving, going out alone, attending events at her children's school, and attending church.  (Tr. 75).[4]

The ALJ fell short, though, in his credibility analysis with respect to Charrette's *mental* impairments.[5]  Despite recognizing that Charrette's "[t]reatment records do corroborate that [she] was diagnosed with [anxiety, post-traumatic stress disorder,[6] and bipolar disorder]," and that she

---

[4] The ALJ also appropriately discounted Charrette's allegations of disabling physical limitations because they were inconsistent with the objective medical evidence. (Tr. 77-78).  The ALJ noted a lack of objective medical evidence supporting the severe limitations and pain level alleged by Charrette, and she has pointed to no medical records during the relevant period which belie that finding.

[5] Although Charrette should have more carefully highlighted evidence that supports her argument regarding the ALJ's credibility analysis, the Court will not find her to have waived the Court's consideration of record evidence not mentioned by her.  *See, e.g., Demars v. Comm'r of Soc. Sec.*, 2013 WL 1326300, at *5 (E.D. Mich. Mar. 31, 2013) ("…resolving the substantial evidence inquiry necessarily involves considering the entire record and the basis of each of the ALJ's findings").    To that end, the Court notes that "Social Security proceedings are inquisitorial, rather than adversarial," *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000), and that the Court has an "obligation to respect, within reason, the remedial purposes underlying the Social Security Act."  *Kirk v. Comm'r of Soc. Sec.*, 2013 WL 1305286, at *5 (W.D. Mich. Feb. 28, 2013).

[6] Charrette alleges that during her service in the U.S. Navy, she was raped by her commanding

had been "prescribed, and [was] taking, psychotropic medication,"[7] (Tr. 77), the ALJ found the impact of her mental impairments to be "not as severe or ongoing as alleged" for five reasons, none of which holds water.  (Tr. 77-78).

The Court first addresses the ALJ's evaluation and use of Charrette's husband's third-party function report to discount her credibility as to her mental impairments.  Repeatedly throughout the ALJ's decision, the ALJ seemed to use Charrette's husband's report regarding her *physical* abilities to discredit her claimed level of *mental* impairments.  For instance, in discussing Charrette's mental impairments, the ALJ first discussed her activities of daily living.  The ALJ found that Charrette had moderate limitations in this area in part because her husband reported that she "drives, goes out alone, and shops."  (Tr. 75).  As to social functioning, the ALJ noted that Charrette's husband "reports that [she] gives car rides to the elderly and assists the elderly with chores."  (*Id.*).[8]  But emphasizing only these aspects of Charrette's husband's report was not a fair way to evaluate her credibility as to her *mental* impairments.  While Charrette's husband did note that she engaged in the referenced activities, he also made clear that he did not believe she was mentally well enough to be doing those things *competently*.  For instance, Charrette's husband wrote that she has problems with "understanding" and "concentration," and is "never" able to actually complete a task.  (Tr. 216-17, 220).  He also indicated that she was not responsible enough to pay bills, handle a savings account, or use a checkbook.  (Tr. 218).  He indicated that while Charrette does go to yard sales, she does "not [do] very well" at them.  (Tr. 219).  Similarly, while Charrette's husband indicated that she gives rides to the elderly due to her

---

officer.  (Tr. 357).  She also alleges that her father physically and sexually abused her.  (Tr. 365).

[7] As of February 8, 2012, Charrette was taking Lexapro, Wellbutrin XL, Xanax, Concerta, Ambien, Abilify, and Lithium Carbonate.  (Tr. 363).

[8] The ALJ seemed to place particular weight on this fact because, in summarizing his conclusion as to Charrette's credibility, he repeated that she "even assists others with car rides…"  (Tr. 78).

"big heart," he also indicated that she did so "to [sic] often for [his] liking." (*Id.*). Finally, when asked to describe any unusual behavior by Charrette, her husband wrote, "her whole behavior is unusual to a normal person." (Tr. 221). On remand, the ALJ should evaluate all aspects of Charrette's husband's report in discussing her credibility.

The ALJ also knocked Charrette's credibility as to the effects of her mental impairments because: (1) "progress notes reveal that [mental health] treatment was generally successful in assisting [Charrette] with her symptoms, stabilizing her mood, and improving her outlook;" (2) "it appears evident that [Charrette's] symptoms were controlled with treatment" and "not as severe as presently alleged" *because* of "continued no-shows on scheduled appointment dates" in the summer of 2011; (3) after Charrette resumed treatment in November 2011, she "was again repeatedly non-complaint with scheduled [mental health] appointments;" and (4) "Dr. Heasley [from whom Charrette sought and received mental health treatment] is not a mental health specialist, but rather, [her] primary care physician." (Tr. 77-78). But a full inspection of the record shows the ALJ's reasoning to be wanting on each of these issues.

The ALJ's first and second points are related, as the ALJ wrote, "progress notes reveal that treatment was generally successful in assisting [Charrette] with her symptoms…Most notably, [Charrette] was discharged from Macomb Family Services in August 2011 due to continued no-shows on scheduled appointment dates, and non-compliance. Thus, it appears evident that [Charrette's] symptoms were controlled with treatment, and [her] non-compliance suggests that symptoms were not as severe as presently alleged." (Tr. 77). There are numerous problems with this aspect of the ALJ's analysis.

First, rather than showing "general success," the progress notes actually show Charrette working on the same issues for the entire three-year period of time (January 29, 2008 to May 16,

23

2011) that she initially treated with her licensed social worker, Sarah Powell. (Tr. 296-330). The much bigger problem with the ALJ's analysis, however, is his conclusion that, *based on* Charrette's August 2011 "no-shows" and alleged "non-compliance," her symptoms were successfully resolved and not as severe as alleged. The Sixth Circuit has recognized that "for a claimant suffering from mental illness, noncompliance with treatment may be a symptom of her condition, rather than evidence that her condition is not disabling." *Polhemus v. Colvin*, 2016 WL 949218, at *4 (E.D. Mich. Mar. 14, 2016). *See also* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *7 (July 2, 1996) (ALJ must not draw any inferences from a failure to seek or pursue certain treatment "without first considering any explanations that the individual may provide, or other information in the case record, that may explain … failure to seek medical treatment"). At the hearing, Charrette was questioned about her August 2011 no-shows with LMSW Powell, and Charrette explained that she believed it was due to Powell's transition to private practice around that time and Charrette's need to get a different doctor to be able to continue treating with Powell. (Tr. 111-112) ("I changed doctors just so I could keep her because she got out of the – original practice…and when she did and went on her own, I had to find a new doctor. That's why I have a doctor so far away now."). The records (Tr. 474-77) corroborate that shortly after Charrette was dropped as a client by Powell's old place of employment, Powell went into private practice and Charrette began treating again with her there. (Tr. 477) ("[Charrette] has requested to resume outpatient psychotherapy services with [Powell] as she was former client of [Powell at Macomb Family Services] prior to [Powell] going solely into private practice."). The Court also notes that, upon Charrette's return to Powell's private practice in November 2011, Powell still found her to be "struggling emotionally". (*Id.*). In short, the ALJ erred in knocking Charrette's credibility, and in concluding that her summer 2011 no-shows evidenced improving symptoms,

24

without addressing these issues.

The ALJ's finding that, after Charrette resumed treatment with LMSW Powell in November 2011, she "was again repeatedly non-complaint with scheduled [mental health] appointments" (Tr. 78), is subject to similar criticism.  It is true that between November 2011 and late October 2013, Charrette canceled numerous appointments with Powell.  However, during that same timeframe, Charrette saw Powell on more than 30 separate occasions.  (Tr. 406-85).  Charrette also had long stretches of time where she did not miss any appointments.  (Tr. 408-439).  And, none of Charrette's "Missed Appointment Notes" suggest she simply failed to show up to her appointment, but rather in each case, she appeared to have canceled ahead of time for a particular reason such as (in most cases) being unable to obtain transportation, and then re-scheduled.  (*E.g.*, Tr. 407, 453, 457, 467, 470, 473).  As above, the ALJ erred in knocking Charrette's credibility by characterizing her as being "non-compliant" with her November 2011 – October 2013 treatment with Powell, without considering these issues.

Finally, the ALJ discredited Charrette, finding it "incongruous that [she] would be non-compliant with scheduled therapy appointments, but would present complaints of symptoms to her primary care physician [Dr. Heasley], who is not a mental health specialist."  (Tr. 78).  This is not a fair criticism; Dr. Heasley was working as a physician at Recovery Pathways, LLC when she was treating Charrette, and it is not at all clear that Dr. Heasley did not specialize in mental health.  (Tr. 366).  Indeed, Dr. Heasley specifically (and apparently solely) treated Charrette's mental health needs, performed psychiatric and mental health examinations, diagnosed mental health illnesses, and prescribed drugs to treat those illnesses.  (Tr. 356-66).  The Court thus does not see the "incongruity" identified by the ALJ.

For all of these reasons, remand is appropriate so that the ALJ may more thoroughly

evaluate Charrette's credibility as to the impact of her mental impairments on her functional capabilities.[9]

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **[16]** be **DENIED**, Charrette's Motion for Summary Judgment **[15]** be **GRANTED IN PART**, the ALJ's decision be **REVERSED**, and this case be **REMANDED** for further proceedings consistent with this Recommendation.


Dated: August 4, 2016                                  s/David R. Grand
Ann Arbor, Michigan                                  DAVID R. GRAND
                                                              United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific

---

[9] About five months after the ALJ issued his November 26, 2013 decision, Charrette was hospitalized.  She had been staying at a shelter due to alleged abuse by her husband, and on April 21, 2014, she had been acting "in a bizarre manner," and had to be restrained by police.  (Tr. 19).  She was taken initially to Detroit Receiving Hospital, and then was transferred and admitted into the Inpatient Psychiatric Unit at Havenwyck Hospital.  (*Id.*).  Doctors found her to be "very much psychotic," and that she had expressed suicidal thoughts.  (Tr. 22).  Charrette remained at Havenwyck for 11 days while doctors adjusted her medications.  (Tr. 20).  On admission her GAF was 20, and it was 37 on discharge.  (*Id.*).  About three months after her discharge, she was involuntarily re-admitted to Havenwyck.  (Tr. 38-42).  Doctors found her to be "delusional and paranoid," and "quite grandiose."  (Tr. 39).  They found her to be a danger to herself and others "due to her unstable mood and psychosis."  (*Id.*).  Although Charrette's counsel provided records of these hospitalizations to the Appeals Council, and although the records are part of the transcript filed in this civil action (Tr. 17-59), he failed to even mention them in the brief he filed on her behalf.  Nevertheless, in light of the above discussion of the ALJ's credibility analysis, on remand, the ALJ should consider these records (as well as any other records available at that time) in evaluating Charrette's claim for benefits.

objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 4, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager